UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CHRISTOPHER HOBBS,              )
                               )
            Plaintiff,         )
                               )
        v.                     )    No. 1:25-cv-00550-JPH-CSW
                               )
KERRY J. FORESTAL, et al.,     )
                               )
            Defendants.        )

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO DISMISS**

Plaintiff Christopher Hobbs sues Marion County Sheriff Kerry Forestal,
the Marion County Sheriff's Office ("MCSO") and former Deputy Christopher
Clayton for injuries he suffered at the Marion County Jail. He alleges that
defendant Deputy Clayton used excessive force against him shortly after his
return to the Jail from brain surgery. The defendants have moved for summary
judgment on Mr. Hobbs's *Monell* claims against the Marion County Sheriff's
Office. They have also moved to dismiss and for summary judgment on Mr.
Hobbs's claims under the Americans with Disabilities Act ("ADA") and
Rehabilitation Act. For the following reasons, the motion for summary
judgment and motion to dismiss are granted.

**I.
Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is
unnecessary because there is no genuine dispute as to any material fact and,
instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ.

1

P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to

the non-moving party and draws all reasonable inferences in that party's favor. *Khungar,* 985 F.3d at 572–73.

### A. Mr. Hobbs's Injury and Placement at the Marion County Jail

Mr. Hobbs was arrested in July 2021. Dkt. 20-1 at 160 (Offender Management System). While detained at the Marion County Jail II, he fell from his bunk and was taken to Eskenazi Hospital for treatment. Dkt. 20-3 at 6-7, 17-18 (Hobbs Dep.).[1] He underwent brain surgery and remained at Eskenazi until his discharge on August 19, 2021, when he was transported to the Marion County Jail I. *Id.* at 6, 17. Because of his medical condition, Mr. Hobbs was placed in the Jail's medical unit. Dkt. 20-1 at 166.

### B. Altercation between Mr. Hobbs and Deputy Clayton

On August 21, 2021, MCSO staff observed Mr. Hobbs banging his bed remote and trying to damage the power supply in his SCU cell. Dkt. 20-1 at 169. The next day, MCSO staff also saw Mr. Hobbs pulling staples from his surgery site and trying to stick the staples into the electrical socket. *Id.* at 172. Mr. Hobbs also threatened to kill himself and electrocute himself and everyone else. *Id.* When MCSO deputies tried to move Mr. Hobbs to suicide prevention housing, he pushed a deputy and refused to comply with commands. *Id.* He was moved to suicide prevention housing because of his actions and his threats of self-harm. *Id.* at 172-173.

---

[1] Citations to Mr. Hobbs's deposition are to the page number of the ECF filing, rather than the page number on the transcript.

Mr. Hobbs testified that on August 24, while he was still on suicide watch, Deputy Clayton pushed his face against a cinder block wall, causing his surgical staples to fall out. Dkt. 20-3 at 23. Deputy Clayton acknowledges he used force against Mr. Hobbs by kicking him in the right leg when Mr. Hobbs attempted to grab him by his right arm. Dkt. 20-4 at 5 (Clayton Dep.). Deputy Clayton denies pushing Mr. Hobbs's head into the wall or acting for any reason other than Mr. Hobbs's having grabbed his arm. *Id.* at 5.

Before the incident, Deputy Clayton had been told in roll call that Mr. Hobbs was in the holding cell on suicide observation because he was pulling staples out of his head. *Id.* at 3. Deputy Clayton did not know that Mr. Hobbs had suffered a traumatic brain injury, but if he had known, he would not have interacted with Mr. Hobbs any differently because he was taught at the academy to kick an inmate in the leg if the inmate grabbed him. *Id.* at 6–7.

Sergeant George Hubbard was Deputy Clayton's supervisor that day. Dkt. 20-5 at 5 (Hubbard Dep.). After the incident, Sergeant Hubbard interviewed Deputy Clayton, another deputy—Deputy Levingston—who saw parts of what happened, and medical staff. *Id.* at 6. During his interview, Deputy Levingston corroborated Deputy Clayton's recollection of the incident. *Id.* at 7. Sergeant Hubbard then reported the incident by email to "a lot of people" in the chain of command, recommending against investigating the incident further because he did not find any actions by Deputy Clayton to be inappropriate. *Id.* at 13–14. No Internal Affairs investigation was conducted regarding this incident. Dkt. 22-4 at 9-10 (Grider Dep.).

Mr. Hobbs was transferred to the hospital for his injuries. Dkt. 22-1 at 6-7. Deputy Clayton has since been terminated from the MCSO for issues unrelated to this case. Dkt. 20-4 at 13.

### C. MCSO Policies and Training

The MCSO had policies and procedures in place for use of force, training, medical, and supervision at the time of the incident. Dkt. 20-1 ¶ 6.

### 1. Use of Force Policy

Under Policy JP2-32, the MCSO provides all security personnel with training to ensure that force and mechanical restraints are used only when necessary to subdue or control individual inmates or to restore order to a disruptive situation. Dkt. 20-1 at 5-16. This policy defines objectively reasonable force as a degree of force which is not excessive and is appropriate to protect oneself or one's property. *Id.* at 5. This policy states that MCSO deputies shall avoid using more force in any situation than is reasonably necessary under the circumstances and shall only use force in accordance with existing law and MCSO Jail Division Procedures after other reasonable alternatives have been exhausted or would be clearly ineffective. *Id.* at 11. The policy provides direction to custody staff on use of force, self-defense tactics, and authorization for use of force. *Id.* at 6-10. The policy also requires that participants complete a report for any incident in which force is used, and that the Jail Commander or his designee review all incidents involving the use of force. *Id.* at 13, 15. In addition, the MCSO disciplines employees when an employee violates the use of force policy. Dkt. 20-1 ¶ 9.

### 2. Deputy Rules and Regulations

The MCSO's Deputy Rules and Regulations state:

> It is the policy of the Marion County Sheriff's Office to use only the force that is reasonably necessary to effectively bring an incident under control. Deputies shall avoid using more force than is reasonably necessary under the circumstance and shall only use force within the boundaries of the law and Department Policy.

Dkt. 20-1 at 55. The Rules and Regulations also include guidance on proper conduct towards inmates and detainees and responsibility for inmates. *Id.* at 38, 52.

### 3. Training

Deputy Clayton underwent four weeks of required Academy training for MCSO deputies. Dkt. 20-6 ¶ 13 at 4-17 (Roberts Dec. and attachment). This included training on the use of force, de-escalation, and all MCSO policies, and 32 hours of physical tactics and defense tactics training that included leg kick training. Dkt. 22-4 at 4. This training is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"), meaning that the training is reviewed every year to ensure that it complies with CALEA standards. Dkt. 20-6 ¶ 7. The training is also accredited by the American Corrections Association ("ACA"). Dkt. 20-7 ¶ 5 ("Stennett Dec."). Further CALEA and ACA accreditation imposes mandatory training standards, including yearly continuing education training of 40 hours, for detention deputies. *Id.* ¶ 7; *see also* dkt. 20-6 ¶ 7. Use of force training is a required element of the annual training. *Id.* ¶ 9; s*ee also* dkt. 20-7 ¶ 7. Deputy Clayton completed the 40-hour annual accreditation jail training from 2021 until 2023. Dkt. 20-7 ¶ 11 at 4-20.

The only training Deputy Clayton received in dealing with inmates with special needs or identifying inmates with special needs occurred in 2023 when he was sent to crisis intervention training for mental health issues. Dkt. 22-3 at 15.

Other than the incident in this case, Deputy Clayton was involved in two other incidents involving inmates that occurred in 2020 and 2023. Dkt. 22-4 at 6-7. In one incident, Deputy Clayton was unable to roll an inmate over to perform CPR, and in the other incident he received a reprimand for pulling an inmate too hard who needed to be restrained. *Id.*

### 4. Supervisors

MCSO policy requires that facility management and supervisory staff receive at least 40 hours of management and supervision training during their first year and 24 hours of management training each year after that. Dkt. 20-1 at 119.

### III.
### Discussion

Mr. Hobbs brings claims against Deputy Clayton and the MCSO alleging that Deputy Clayton used excessive force, state law excessive force and battery, and claims under the ADA and the Rehabilitation Act. The MCSO moves for summary judgment on the *Monell* claims against it and on the ADA and Rehabilitation Act claims.[2]

---

[2] Defendants do not move for summary judgment on the claims against Deputy Clayton in his individual capacity. *See* dkt. 21 at 1. Any claim against Deputy Clayton in his official capacity "is another way of pleading an action against an entity of which the officer is an agent," so such a claim is redundant with the *Monell* claim. *Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011); *see Stanek v. St. Charles Comm. Unit Sch. Dist. No. 303*, 783 F.3d 634, 640 (7th Cir. 2015).

7

## A. *Monell* Claim

The MCSO "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees. [It] can, however, be held liable for unconstitutional ... policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)). Mr. Hobbs does not base his claim on an expressed policy or custom of the MCSO, but on the MCSO's alleged failure to train or to enact policies that would have prevented Deputy Clayton's alleged use of excessive force. Dkt. 23 at 11–14. The Seventh Circuit has explained that "the path to *Monell* liability based on inaction is steeper":

> [U]nlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous. For these reasons, where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020).

The Seventh Circuit has similarly explained that a municipality's failure to train employees can support § 1983 liability only when the municipality is deliberately indifferent to the risk of harm. *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). In other words, liability based on a failure-to-train theory arises only when the municipality uses a training program that it knows "or should know

8

has failed to prevent tortious conduct by its employees." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). This does not require proof of widespread constitutional violations; a single violation can also suffice if "the plaintiff asserts a recurring, obvious risk." *Id.*

It is undisputed that the MCSO maintains training policies on the use of force and de-escalation techniques and that these policies satisfy the CALEA and state requirements. Dkt. 20-6 ¶ 6-8. Mr. Hobbs argues, however, that the MCSO should have trained deputies, including Deputy Clayton, how to handle inmates that had recently been released from surgery or that had special needs, including risk of suicide or self-harm. *See* dkt. 23 at 12–13. Mr. Hobbs contends, without citation to any other incidents of similar uses of force at the Jail, that this need for further specific training was so obvious that the MCSO should be held liable for failing to provide it. *Id.* He argues that the MCSO should have known such training was necessary because it had special cells to hold inmates on suicide watch and closely followed the progress of inmates who were transferred to the hospital. *Id.*

Mr. Hobbs has not designated evidence that would allow a reasonable jury to conclude that the MCSO can be held liable for failing to train Deputy Clayton on the specific use of force against inmates with traumatic brain injuries. He has designated no evidence of a recurring pattern of excessive force against inmates with head injuries or any other special medical needs. *See Flores*, 997 F.3d at 731 ("What separates [failure to train *Monell*] liability from traditional *respondeat superior* liability is a known pattern of tortious conduct

9

demonstrating the need for additional training."). Mr. Hobbs points out that Deputy Clayton was involved in two other incidents, in 2020 and 2023, one which involved his attempt to roll an inmate over to perform CPR and another involving pulling an inmate too hard when attempting to restrain him. Dkt. 23 at 6. But Mr. Hobbs does not argue that those incidents show a pattern of excessive force, *see id.* at 11–14, and has not designated evidence that they involved inmates with head injuries or who presented a risk of suicide. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.").

This also is not a case when "a single violation can suffice" because of "a recurring, obvious risk." *Flores*, 997 F.3d at 731. At most, Mr. Hobbs has shown that the jail would have recurring inmates who had been in the hospital or on suicide watch. *See* dkt. 23 at 13. But the undisputed designated evidence is that the MCSO still provided extensive use of force training governing interactions with all inmates. *See* dkt. 20-1 at 5-16; dkt. 22-4 at 4. Mr. Hobbs has not shown that the risk to specific groups of inmates was "so patently obvious" that the MCSO was deliberately indifferent in providing only the training that it did. *Flores*, 997 F.3d at 732 ("We realize that the Supreme Court has yet to issue an opinion in which it upholds liability on this ground."); *cf. J.K.J.*, 960 F.3d at 382 (affirming jury verdict against municipality where "the County was aware of sexual misconduct happening within its jail" and the

10

county's training was limited to informing guards that the jail prohibited sexual contact with inmates).

Mr. Hobbs has not designated evidence of a pattern of violations or a sufficient single violation, so there wasn't a "patently obvious need to provide additional training to MCSO deputies on use of force with special needs inmates," dkt. 24 at 9. The MCSO is therefore entitled to summary judgment on the failure-to-train theory. *See Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *cf. Flores*, 997 F.3d at 733 (reversing dismissal of *Monell* claim based on a complaint that South Bend officer killed a motorist because of his reckless driving and noting the complaint asserted three prior occasions the officer acted recklessly and that the municipality knew that its officers routinely drove recklessly and took no action to prevent it).

Mr. Hobbs next argues that the MCSO can be held liable under *Monell* for its failure to supervise Deputy Clayton. He contends that, during the incident at issue, other correctional officers were nearby in the guard shack but did not intervene. Dkt. 23 at 14. Jail officials can be liable for failing to protect inmates from harm by other officers when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)).

In sum, the MCSO can be liable for only its own actions and cannot be subject to vicarious liability for Deputy Clayon's actions. Mr. Hobbs has not

designated evidence that would allow a jury to find the MCSO liable for failure to train or failure to supervise. *See Ruiz–Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) ("Failure-to-supervise claims, like failure-to-train claims, are a tenuous form of *Monell* liability . . . because such claims seek to hold a municipality liable not for directly inflicting injury . . . but rather for causing an employee's misconduct."); *Simpson*, 860 F.3d at 1005-06. The MCSO is therefore entitled to summary judgment on Mr. Hobbs's *Monell* claim.

### B. ADA and Rehabilitation Act Claims

Finally, the MCSO moves to dismiss and moves for summary judgment on Mr. Hobbs's claims under the ADA and Rehabilitation Act. These claims were raised in Mr. Hobbs's initial complaint, which contained claims about this incident and the separate incident in which Mr. Hobbs fell from his bunk at Jail II. This case was severed from Mr. Hobbs's claim regarding his fall from the bunk and the MCSO contends that Mr. Hobbs's ADA and Rehabilitation Act claims applied only to the Mr. Hobbs's bunk case. Mr. Hobbs agrees that these claims can be dismissed from this case. Dkt. 23 at 15. Therefore, the motion to dismiss and motion for summary judgment are granted as to the claims based on the ADA and Rehabilitation Act.

### IV.
### Conclusion

The MCSO's motion for summary judgment, dkt. [20], and motion to dismiss, dkt. [9], are **granted**. Mr. Hobbs's *Monell* claims, including any official-capacity claim against Deputy Clayton, and his ADA and Rehabilitation Act

claims are **dismissed**. Defendants did not move for summary judgment on the excessive force claims against Deputy Clayton in his individual capacity or the state law claims, so those claims will proceed.

The magistrate judge is requested to hold a conference to discuss further proceedings in this case.

**SO ORDERED.**

Date: 3/24/2026

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All Electronically Registered Counsel

Magistrate Judge Crystal Wildeman